## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

**FRED D. DOUTY,**

   **Plaintiff,**

**v.**            **Case No. 2:13-cv-24714**

**DAVID BALLARD, Warden,**
**PAUL PERRY, Associate Warden of Security,**
**STEVE CAUDILL, Captain,**
**RONNIE WILLIAMS, Captain,**
**CHRIS BLAKE, Principal,**
**JAMES PENNINGTON, Educational Instructor,**
**and MIKE CLEMENS, Case Manager,**
**all in their individual and official capacities,**

   **Defendants.**

### PROPOSED FINDINGS AND RECOMMENDATION

   This civil action is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court is a Motion to Dismiss filed by defendant Chris Blake (ECF No. 28) and a Motion to Dismiss filed by defendants David Ballard, Paul Perry, Steve Caudill, and Ronnie Williams (ECF No. 31), in which defendant Blake also joins (ECF No. 34).[1]

---

[1]  Because defendants Pennington and Clemens appear to have been improperly named in the Amended Complaint, they have not yet been served with process.  The plaintiff has filed motions to correct the names of these defendants and has requested that service of process again be attempted on these defendants.  The undersigned will address those motions by separate order.

## PLAINTIFF'S ALLEGATIONS AND PROCEDURAL HISTORY

This case is proceeding on the plaintiff's verified Amended Complaint (ECF No. 12), which was filed on March 4, 2014.  The plaintiff has named David Ballard, Warden at the Mount Olive Correctional Complex ("MOCC"), Paul Perry, the Associate Warden of Security, Steve Caudill, a Captain, Ronnie Williams, a Captain, Chris Blake, Principal, James [sic; John] Pennington, Educational Instructor and Mike Clemens [sic Matthew Clemons], Case Manager, as defendants, each being sued in both their individual and official capacities.  The plaintiff seeks declaratory and injunctive relief.

The plaintiff alleges that he is a "Messianic Jew" confined in the Quilliams segregation units at the Mount Olive Correctional Complex ("MOCC") in Mount Olive, West Virginia.  As a condition of his confinement in segregation, the plaintiff must complete the Quality of Life program ("QOL program") in order to advance back to placement in the general population of the prison.  (ECF No. 12 at 4, ¶ 15).  The QOL program requires inmates to complete certain educational packets, which the plaintiff alleges are neither educational nor rehabilitative, but merely reflect the inmate's thoughts and feelings, and are completed without any advice or instructions from defendants Blake or Pennington, who are alleged to "be in charge of education at MOCC."  (*Id.*, ¶ 16).

The plaintiff's Amended Complaint further alleges that, on or around January 25, 2013, defendants Blake and Pennington placed the plaintiff in non-compliant status for writing religious beliefs in his QOL packets.  (*Id.* at 5, ¶ 17 and Exs. B-1 to B-3).   The plaintiff further alleges that he immediately inquired about this decision, worked to fix the situation and was placed back on as compliant.  (*Id.*)

The plaintiff's Amended Complaint further alleges that, after receiving the same packet on March 1, 2013, the plaintiff again wrote religious beliefs in the packet and was again placed in non-compliant status; however, this time, defendants Blake and Pennington refused to put him back on as being compliant and never spoke to the plaintiff about the issue of writing religious answers.  (*Id.*, ¶ 18 and Exs. D-1 to D-7 and E-1 to E-3).

The plaintiff further alleges that, on May 22, 2013, defendant Perry did not allowed the plaintiff to attend a PRO-Committee hearing and was not allowed to present evidence about his QOL packet responses.  (*Id.*, ¶ 19 and Exs. D-2 and E-3). Subsequently, the plaintiff was dropped from a level three to a level one in the QOL program, and he was moved to the Quilliams II unit, despite the fact that he had not received any misconduct reports and had been free of violation reports for around 17 months.  (*Id.*, ¶ 20).  The plaintiff claims that this decision was "punishment" for writing Messianic Jewish beliefs in his QOL packets.  (*Id.*)

The plaintiff's Amended Complaint further alleges that, on or around July 16, 2013, defendant Clemens told the plaintiff that "he couldn't write religious answers" and "he wouldn't advance [through the QOL program] unless he told Clemens that he would stop writing those religious beliefs."  (*Id.* at 6, ¶ 21).  The plaintiff further alleges that, on August 20, 2013, he was supposed to advance to Level 2 of the QOL program, but defendants Clemens and Williams did not hold the scheduled hearing because the plaintiff didn't say he would stop writing religious answers in QOL packets.  (*Id.*, ¶ 22).

The plaintiff's Amended Complaint further alleges that, on August 24, 2013, defendants Clemens and Williams denied the plaintiff a hearing to advance to Level 2 of the QOL program because he refused to say that he would stop writing his religious

beliefs in his QOL packets. (*Id.*, ¶ 23 and Exs. G-3 and G-4). Consequently, the plaintiff alleges that the defendants are "forcing the plaintiff to choose between his religious beliefs or moving back to general population, thus forcing their own religious thinking upon him." (*Id.*, ¶ 24).

The Amended Complaint contains five counts: Denial of Freedom of Religion (Count One), Denial of Due Process (Count Two), Cruel and Unusual Punishment (Count Three), Discrimination and Denial of Equal Protection (Count Four), and Denial of Freedom of Speech (Count Five). (ECF No. 12, *passim*). The undersigned will address each count *infra*.

On August 29, 2014, defendant Blake filed a Motion to Dismiss (ECF No. 28) and a Memorandum of Law in support thereof (ECF No. 29). On September 2, 2014, defendants Ballard, Caudill, Perry and Williams (hereinafter "the DOC Defendants") filed a Motion to Dismiss (ECF No. 31) and a Memorandum of Law in support thereof (ECF No. 32). These defendants also filed a number of exhibits in support of their motion, which the undersigned declines to consider. Accordingly, the court will assess the plaintiff's claims under the Rule 12(b)(6) and *Twombly/Iqbal* standards addressed below. On September 5, 2014, defendant Blake also joined in the arguments made by the DOC Defendants. (ECF No. 34).

On September 12, 2014, the plaintiff filed a Memorandum of Fact and Law in Opposition to Defendant Chris Blake's Motion to Dismiss (ECF No. 37). On September 19, 2014, the plaintiff filed a Response and Memorandum in Opposition to the DOC Defendants' Motion to Dismiss (ECF No. 39). On September 26, 2014, the DOC Defendants filed a Reply brief (ECF No. 42). Defendant Blake did not file a reply. These motions are now ripe for adjudication.

## STANDARD OF REVIEW

The defendants' motions assert that the plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.  In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.  The Court wrote:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).  Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556.
> * * *
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."  *Id.* at 678.

The defendants' motions will be reviewed under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the *Twombly/Iqbal* standard.

## ANALYSIS

Defendant Blake's Memorandum of Law begins by discussing the parameters of the QOL program.  His Memorandum states in pertinent part:

> The Quality of Life Program is a five (5) level stratified program that rewards prisoners administratively segregated with increasing privileges for successful completion and good behavior.  (See Mount Olive Correctional Complex Operational Procedure 3.36, attached to Plaintiff's Amended Complaint as Exhibit H-3).  By contrast, it provides disincentive to inmates who continue to violate the rules by requiring inmates to repeat all or portions of the program after rules violations, non-compliance or poor behavior.  *Id.*
>
> One aspect of the Quality of Life Program is educational programming administered by the Department of Education.  The inmates are provided with education materials that contain chapters on specific topics, such as physical well-being, transitions skills, hygiene, substance abuse and the like.  (See Exhibit C to Plaintiff's Amended Complaint.)  Inmates are required to review the materials and provide answers that are responsive to the particular subjects and topics in each chapter.  If an inmate does not complete the worksheets, or provides answers that are not responsive to the subject, the inmate may be deemed non-compliant.  Here, Plaintiff's answers in the educational worksheets were not responsive to the subject matter and he was determined to be non-compliant with the educational program.

(ECF No. 29 at 1-2).

Defendant Blake's Memorandum of Law further asserts that he is an employee of the West Virginia Department of Education, not the West Virginia Division of Corrections ("DOC") and, as a result, he claims he has no authority to advance or demote an inmate's level in the QOL program, and "is not a party to the [DOC's]

hearings regarding inmates within the [QOL] program." (ECF No. 29 at 5). His Memorandum further states that "Blake can only recommend to the Division of Corrections whether an inmate is compliant with the educational program." (*Id.* at 2). Blake's Memorandum of Law further asserts that Blake does not attend or have any involvement in the administrative segregation hearings in which such determinations are made. (*Id.*) Thus, defendant Blake contends that the plaintiff's due process and cruel and unusual punishment claims, which are grounded in the decisions by WVDOC employees concerning his advancement through the QOL program, fail to state a claim upon which relief can be granted against him, as he has no direct involvement in those decisions. (*Id.* at 5-6).

The plaintiff's Response to Blake's Motion to Dismiss asserts that, although he is technically an employee of the Department of Education, Blake "has authority to issue disciplinary rule violation reports to inmates" and can "make recommendations at hearings on inmate discipline and classification, housing assignments and parole. (ECF No. 37 at 10-11). For the purpose of the pending motions, which require the court to take the plaintiff's allegations as true, the undersigned will address the claims against defendant Blake [and Pennington] in conjunction with the DOC Defendants as though he has the same or similar authority.

The DOC Defendants' Memorandum of Law provides more detail about the plaintiff's custody status and behavioral history, noting that he has been in the "Control Unit," either on punitive or administrative segregation, since April 2010, when he was transferred to MOCC after being found guilty of two counts of "exposing bodily fluids." (ECF No. 32 at 1 and n.1). The DOC Defendants' Memorandum of Law further describes

the conditions of confinement in the Control Unit/administrative segregation and the

QOL program as follows:

> The Control Unit at Mt. Olive houses those inmates who cannot be housed in a safe and secure manner in the general inmate population. (Plaintiff's Exhibit/Document 12-8 at pp. 8-9 of 34). General conditions in the Control Unit are governed by Mt. Olive's Operational Procedure #3.30. Inmates are kept in segregation type conditions and permitted one hour of out-of-cell recreation five days a week; contact and interaction with other inmates in the unit is minimized and also highly controlled. Inmate movement and conduct is closely controlled and regulated. (Plaintiff's Exhibit/Document 12-8 at pp. 8-21 of 34).

> Inmates, such as the Plaintiff, who are assigned to administrative segregation at Mt. Olive, are also assigned to the Quality of Life program and are required to successfully complete this programming before they can be released from the Control Unit. (Plaintiff's Exhibit 12-8 at pp. 10, 22-30 of 34). The Quality of Life program is an educational and behavioral program designed to enable inmates to develop and demonstrate the behavioral skills necessary for them to function in a safe and secure manner if released from administrative segregation and returned to general inmate population. (Plaintiff's Exhibit/Document 12-8 at pp. 22-30 of 34). More specifically, the Quality of Life program provides for the management of administrative segregation inmate populations with a stratified incentive program based on an increased level of privileges for demonstrated appropriate inmate behavior and program compliance. (Plaintiff's Exhibit/Document 12-8 at 22 of 34). The Quality of Life program has five stratified levels of increasing privileges within the Control Unit. An inmate starts at Level One of the program and moves up in levels upon his completion of the assigned education program for the Level and upon his demonstration of appropriate inmate behavior and program compliance with programming, including assigned education programs, may be dropped down in level and required to repeat a level or levels. Once an inmate has successfully completed Level Five of the Quality of Life program, he may be progressed to general inmate population. (Plaintiff's Exhibit/Document 12-8 at p. 27 of 34).

(ECF No. 32 at 1-3).

The DOC Defendants' Memorandum of Law describes the plaintiff's claims for

relief as follows:

> This case is filed under 42 U.S.C. § 1983. The Plaintiff challenges the Defendants' actions between January and August 2013 wherein the Defendants deemed him non-compliant with programming because he

8

wrote religious beliefs as responses to the education assignment packets and, as a result, dropped him to Level One of the [QOL] program. The Plaintiff sets forth in his Amended Complaint the following violations of federal law and of the United States Constitution:

(1) The Defendants have violated the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), by requiring the Plaintiff to provide non-religious responses to certain assigned educational programming in the [QOL] program. He is forced to provide non-religious responses in order for him to be deemed compliant with his programming, complete the [QOL] program and return to general population.

(2) The Defendants have violated the Plaintiff's Due Process rights by not providing him certain reviews under the [QOL] program because he was deemed non-compliant with his assigned educational programming.

(3) The Defendants have inflicted cruel and unusual punishment by dropping the Plaintiff to Level One of the [QOL] program.

(4) The Defendants have discriminated against the Plaintiff and denied him equal protection of the law by requiring him to provide non-religious responses to his educational assignment.

(5) The Defendants have denied the Plaintiff freedom of speech by requiring him to provide non-religious responses to his educational assignment packets.

The Plaintiff seeks [a] declaratory judgment that the above cited rights have been violated. The Plaintiff also seeks injunctive relief, to-whit: an order allowing him to write his religious beliefs in his [QOL] education packets; an order advancing him to either Level Three, Four or Five of the [QOL] program; an order placing him back in general inmate population; and an order requiring him to be moved to the Northern Correctional Facility.

(ECF No. 32 at 4-5). The undersigned will now address each of these claims in turn.

## A.    Count One - Denial of Freedom of Religion.

In 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc-1(a)(1)-(2). Section 3 of RLUIPA governs restrictions

on religious exercise by institutionalized individuals by state or local governments. RLUIPA provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  The Act defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  A "substantial burden on the religious exercise of a person" "'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,' or . . . forces a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'"  *Smith v. Ozmint*, 578 F.3d 246 (quoting *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006)).  Again quoting from *Lovelace*, the *Smith* decision noted that courts may "not judge the significance of the particular belief or practice in question."  *Lovelace,* 472 F.3d at 187 n.2.  *Id.*

A prisoner's rights under RLUIPA are more expansive than those under the First Amendment.  *See Lovelace*, 472 F.3d at 199-200.  RLUIPA "affords to prison inmates a heightened protection from government-imposed burdens, by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest."  *Smith v. Allen*, 502 F.3d 1255, 1266 (11th Cir. 2007) (internal quotation marks omitted), *abrogated on other grounds by Sossamon v. Texas*, ____ U.S. ____, 131 S. Ct. 1651, 179 L. Ed.2d 700 (2011).  The Supreme Court has noted, however, that "[w]e do not read

RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005).

Furthermore, the legislative history of the Act demonstrates that lawmakers "were mindful of the urgency of discipline, order, safety, and security in penal institutions." *Id.* at 723 (citing the remarks of Se. Hatch, 139 Cong. Rec. 26190 (1993)). The Supreme Court further noted that the drafters of the Act "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." *Id.* (Joint Statement 16699 (quoting S. Rep. No. 103-111 at 10, U.S. Code Cong. & Admin. News 1993, pp. 1892, 1899, 1900.))

As described by the DOC Defendants in their Memorandum of Law, the plaintiff alleges that the defendants have violated RLUIPA because: 1) the defendants informed him that his "religious" responses to certain educational programming assignments were not appropriate responses for the particular assignments; (2) the defendants judged him to be non-compliant with those educational packets and that he will remain non-compliant until he provides "non-religious" written responses for those assignments; (3) the defendants have dropped him to Level One of the QOL program and will not advance him until he is compliant with the this educational programming. (ECF No. 32 at 7-8). Thus, the plaintiff alleges that he is forced to choose between his religion and completing the QOL program in order to be released from segregation to

the general population of the prison and, therefore, his ability to express his Messianic Jewish tenets has been substantially burdened.

Once a substantial burden has been shown, the prison authorities must establish that the policy or requirement causing the substantial burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest. *Smith*, 578 F.3d at 252. The first step is to explain the reasons for the policy (what is the compelling governmental interest?) *Id.* at 253. The second step is to demonstrate that the policy is the least restrictive means of furthering that interest. *Id.* "In other words, the [defendants] must provide a substantive, relevant explanation as to why [the subject policy or requirement is] the least restrictive means of enforcing the compelling interest advanced." *Id.*

The DOC defendants' Memorandum of Law asserts that "[a]s a general matter, an inmate's practice of religion is not substantially burdened by requiring the inmate to complete religious neutral programming while in prison and to show some mastery of the subject matter taught in his required assignments." Their Memorandum of Law further states:

> Where a Plaintiff has sufficient alternative outlets to exercise his religion or an aspect of his religion, the fact or allegation that the government does not allow him to practice his religion at a certain time or place does not state a claim that the Plaintiff's exercise of religion has been substantially burdened. *See Calvary Christian Center v. City of Fredericksburg*, 800 F. Supp. 760, 774-[775] (E.D. Va. 2011) (No substantial burden in prohibiting Church from operating day school on the grounds of one of its ministries, where there are available alternative locations for the Church to permissibly operate the day school besides the desired location). The Plaintiff does not allege in his Amended Complaint that there is an aspect of his religion that he is or has been unable to practice if he is required to complete educational programming using only "non-religious" written responses. In fact, a review of the relevant Operational Procedures provided by the Plaintiff show that he has ample opportunity or alternatives to practice the tenets of his religion while in

the Control Unit, even if he cannot express his Messianic Jewish tenets while completing his written responses to assigned educational programs. (Plaintiff's Exhibit/Document 12-8 at pp. 34 of 34).  The Plaintiff is permitted to possess and read a Bible, as well as other religious materials. (Plaintiff's Exhibit H-2/Document 12-8 at p. 19 of 34 and Exhibits K-1 through 5/Document 12-1).  The Plaintiff is permitted to possess a writing tablet and writing utensils with which he can express in writing any thoughts about his religion as well as express how his religion can be incorporated into and enhance the educational programming provided to him. [FN 6]  (Plaintiff's Exhibit H-2/Document 12-8 at p. 19 of 34).  The plaintiff is permitted to correspond with other people by mail and discuss and express his religious tenets.  (Plaintiff's Exhibit H-2/Document 12-8 at p. 13 of 24 and Exhibit H-3/Document 12-8 at p. 23 of 34).  The Plaintiff is able to discuss and express his religious views with other inmates in the cells adjacent to his and while in recreation with him.  In as much as the Plaintiff seeks to read the Bible and pray, or seek to convey to others the importance of reading the Bible and praying, he has ample opportunity to do so outside of his assigned educational programming.  The inconvenience to the Plaintiff's religious practice by requiring him to take some time out of his day to complete non-religious educational programming is not a "substantial burden."

[FN 6 – There is no prohibition that the Plaintiff cannot write down non-religious responses in his worksheets and then write his own religious responses to the same educational materials in a separate writing tablet for his own use and practice.]

(ECF No. 32 at 10-11).

The DOC Defendants' Memorandum of Law further asserts that a requirement that an inmate complete assignments unrelated to his religion does not unduly pressure him to modify his practice of religion.  (*Id.* at 11).  Their Memorandum of Law further states:

The facts as alleged by the Plaintiff do no show that he has been substantially pressured to modify his religious behavior and or significantly violate his beliefs, or has been forced to choose between following the precepts of his religion and being unable to advance in the Quality of Life program on the one hand, and abandoning one of the precepts of his religion.  In as much as he has been pressured, the Plaintiff has been "pressured" only to complete his educational assignment in a manner which adequately responds to the given assignments.  [FN 7]

[FN 7 – A prison may require an inmate to attempt to complete his G.E.D., teach the inmate math, and deem the inmate non-compliant if he answers his math questions with "Read the Bible."]

(*Id.* at 11-12).

The DOC Defendants' Memorandum of Law further asserts:

Moreover, the Plaintiff has not stated in his Amended Complaint how exactly responding to the assigned educational worksheets with non-religious answers, which show he has understood or mastered the assigned materials, has forced him to abandon a precept of his religion, violate a belief or modify his religious behavior. The Amended Complaint does not identify a religious tenet or practice that is incompatible with his providing responses to the relevant programming materials in a manner which does not refer to his religion. Here, requiring non-religious responses to his educational programs would not prevent him from reading the Bible, expressing in writing his basic religious tenets, or practic[ing] any other aspect of his religion.

(*Id.* at 12). Finally, the DOC Defendants assert that requiring the plaintiff to complete his educational programming in a manner that shows acceptable mastery of the materials concerning skills necessary to safely and smoothly return to the general prison population furthers a compelling governmental interest and is the least restrictive means of achieving that interest. (*Id.* at 12-13). Likewise, the DOC Defendants "have a compelling interest in housing the Plaintiff in the Control Unit until he can demonstrate that he can be returned to general inmate population in a manner consistent with the safe, secure, orderly operation of Mt. Olive." (*Id.* at 13). The DOC Defendants assert that requiring the plaintiff to complete the QOL program is the least restrictive alternative, and that the RLUIPA standards should be applied "with due deference to the experience and expertise of prison and jail administrators." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005). (*Id.*)

Defendant Blake's Memorandum of Law adds:

14

The requirement that Plaintiff write responsive answers in his educational worksheets, in and of itself, does not rise to a substantial burden. Critically, Plaintiff is not prohibited from including his religious thoughts or beliefs as part of his responses, provided they are relevant and responsive to the subject matter, topic or issue.  The problem is, Plaintiff made no attempt to incorporate his religious beliefs in a manner that related to the topic.

Furthermore, Plaintiff is not prohibited from practicing his religion or expressing his religious beliefs.  Indeed, Plaintiff does not assert that he was prohibited from practicing his religion outside the extremely narrow context of his written responses in the educational worksheets.  Plaintiff is permitted access to religious reading material [and] Plaintiff is permitted access to religious guidance. . . .  In sum, a requirement that Plaintiff provide responsive answers in the educational program does not constitute a "substantial burden" on Plaintiff's right to practice his religion.

(ECF No. 29 at 4-5).

The plaintiff's Responses, which are excessively lengthy,[2] assert that the plaintiff has been "punished, intimidated and coerced into significantly modifying central tenets of his religion, which were witnessing through writings and expressing to others about his faith and the Word of God."  (ECF No. 37 at 14; ECF No. 39 at 17).  The plaintiff's Response to the DOC Defendants' Motion further states:

Before January 25, 2013, the Plaintiff has never been placed on non-compliance.  It was not until he witnessed with Messianic Jewish beliefs in QOL packets that he was placed on non-compliance, a direct result of Defendant Blake and Pennington's finding these religious answers inadequate and offensive.

(ECF No. 39 at 5).  The plaintiff's Response to the DOC Defendants' motion further states:

---

[2]  The plaintiff's Response to defendant Blake's Motion to Dismiss is 34 pages and his Response to the DOC Defendants Motion to Dismiss is 40 pages in length, both in violation of the 20-page limit for memoranda set forth in Local Rule 7.1(a) of the Local Rules of Civil Procedure for the United States District Court.  While the undersigned is not striking or rejecting these memoranda, the court will not continue to tolerate the filing of memoranda that do not comply with this rule, or that do not seek leave of court to file a memorandum that exceeds the page limit, which are disfavored, but may be granted upon a showing of good cause. L. R. Civ. P 7.1(a)(2).

Moreover, these packets which are supposedly designed to prepare the Plaintiff for reintegration into the general population are confusing and uninformative; and they belittle and deride the Plaintiff and central tenets to his religion. The packets were written by MOCC inmate Eugene Robert Anderson and read, reviewed and approved by Defendants Ballad, Chris Blake and James Pennington.

The questions in the packets are open to interpretation asking the Plaintiff to answer with his own "thoughts and feelings" which he demonstrated *supra*; as there is no answer key. No instruction is provided with the packets, nor does anyone come and assist with questions or ever available to show why Plaintiff may be placed in non-compliance. Failure to complete packets or Defendants Blake and Pennington's arbitrary decision that an answer is inadequate or does not conform to their own "thoughts or beliefs" results in the Plaintiff being made unable to progress through QOL Levels . . . .

(ECF No. 39 at 4).

The plaintiff's Responses further emphasize that the defendants must demonstrate that the challenged policy is the "least restrictive means of furthering a compelling governmental interest." *See Couch v. Jabe*, 679 F.3d 197 (4th Cir. 2012). (ECF No. 39 at 21). His Response to Blake's Motion to Dismiss specifically contends:

More importantly, defendant asserts because of this alleged non-compliance plaintiff poses a threat to prison staff and other inmates; all without demonstrating how not allowing him to answer with central tenets is the least restrictive means of achieving a compelling interest. Inter alia, demonstrating how his religious writings in packets pose a direct threat to prison staff, other inmates or the security of the prison. *See* 42 U.S.C. § 2000cc-1a (RLUIPA); *see also Spratt v. Rhode Island Dep't of Corrections*, 482 F.3d 33, 38-40 (1st Cir. 2007); *O'Bryan v, Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003) (officials "must demonstrate, and not just assert, that the rule at issue[] is the least restrictive means of achieving a compelling interest;" refusing to assume without proof that rule against "casting of spells/curses" was necessary to avoid fights).

Furthermore, defendant must show under RLUIPA that his policy is the "least restrictive means" of serving the compelling interest that he claims - that is, that there is no way to accomplish some necessary purpose that is more respectful of plaintiff's religious rights than the practice being challenged.

16

(ECF No. 37 at 15-16).  He repeats this assertion in his Response to the DOC Defendants'
motion.  (ECF No. 39 at 22).  The plaintiff further contends that "not only is the policy of
'no' religious responses in QOL packets not necessary to serve a compelling interest, but
[it] has 'no' penological interest regarding necessary regulations and procedures to
maintain good order, security and discipline, consistent with consideration of costs and
limited resources."  (ECF No. 39 at 21-22).

Thus, the plaintiff contends that he has sufficiently shown that the acts alleged
impose a substantial burden on the exercise of central tenets of his religion and the
defendants have failed to meet the compelling interest /least restrictive means test and,
therefore, Count One should not be dismissed.  (ECF No. 37 at 17; ECF No. 39 at 23-24).

The DOC Defendants' Reply asserts that "[o]utside of not being able to express
himself religiously in completing his [QOL] packets, the Plaintiff does not allege any
other restriction in his ability to practice his religion placed upon him by the
Defendants."  (ECF No. 42 at 2).  Their Reply further contends that the "substantial
burden" element "does not mean that every constraint of an inmate's religious practice
will be considered 'substantial' and, thus, subject to RLUIPA's protections, and that
defining that element to enable an inmate to be able to practice his religion wherever
and whenever he sees fit would necessarily prevent prisons from requiring inmates to
undertake any activity without simultaneously allowing them to express their religion,
unless that activity is deemed to support a compelling interest and is the least restrictive
alternative.  (*Id.* at 2-3).  The defendants again emphasize that:

> Within the Fourth Circuit, it has been found that where a Plaintiff has
> sufficient alternative outlets to exercise his religion or an aspect of his
> religion, the fact or allegation that the government does not allow him to
> practice his religion at a certain time or place does not state a claim that
> the Plaintiff's exercise of religion has been substantially burdened.

* * *

>        In as much as the Plaintiff is simply complaining that he is not able
> to write, express or speak about his religion to specific members of the
> Education Department, the Plaintiff has not alleged that he cannot
> communicate with members of the Education Department through other
> means or venues or that, as a matter of law, his religious practice is
> substantially burdened because he cannot communicate his religious
> beliefs to a few select persons of his choosing out of the general public.

(*Id.* at 3, 5).

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has failed to demonstrate that the conduct of the defendants has imposed a substantial burden on the plaintiff's right or ability to exercise his religious beliefs. Because the plaintiff has failed to establish the first element of a RLUIPA violation, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiff's Amended Complaint fails to state a claim upon which relief can be granted against any of the defendants with respect to Count One concerning denial of religious freedom.

### B.    Count Two – Denial of Due Process.

In Count Two of his Amended Complaint, the plaintiff alleges that defendants Perry, Ballard, Blake and Pennington violated his right to due process of law by refusing to allow him to attend his PRO-committee[3] hearing on May 22, 2013 and denying him the right to present evidence in his favor.  (ECF No. 12 at 7).  He further alleges that defendants Clemens and Williams "exercised deliberate indifference to plaintiff" by denying him an opportunity to attend his Level One status review hearing, to review the evidence presented therein and to present his own favorable evidence.  (*Id.* at 8).

---

[3] The PRO-committee is the "Progressive Reintegration Opportunity Committee" which is believed to conduct regular reviews of the status of inmates in administrative segregation and determines their progression through the levels of the QOL program.  The undersigned notes that the QOL policies provided by the plaintiff with his Amended Complaint indicate that QOL assignments are not classification levels.  (ECF No. 12, Ex. H-3 [12-8 at 22]).

Finally, the plaintiff alleges that defendant Caudill "exercised deliberate indifference to plaintiff" by failing to allow him to remain at Level Three and never offered any hearing on dropping his levels, despite him being "violation report free." (*Id.*)

Both of the defendants' Memoranda of Law assert that the plaintiff has not established that he has a liberty interest in not being in the Control Unit/administrative segregation and the QOL program. (ECF No. 29 at 6; ECF No. 32 at 13-14). The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits a State from depriving "any person of life, liberty, or property, without due process of law." However, as a result of his conviction and imprisonment, a prisoner's protected liberty interests are significantly reduced. As noted by the Supreme Court in *Sandin v. Conner*, "the Due Process Clause does not protect every change in the conditions of confinement having a substantial adverse impact on the prisoner" and "the Due Process Clause did not itself create a liberty interest to be free from intrastate prison transfers." 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano*, 427 U.S. 215 (1976)). In the prison context, a liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

In *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997), the United States Court of Appeals for the Fourth Circuit reiterated that, "[i]n order to prevail on either a procedural or substantive due process claim, inmates must first demonstrate that they were deprived of life, liberty, or property" by governmental action. The Court found that Maryland inmates in administrative segregation who claimed to be surrounded by vermin, human filth and water from leaking toilets, denied air conditioning, served cold food in meager portions, denied outdoor recreation, and given <u>no</u> educational or

religious services, had failed to meet the *Sandin* standard.  Thus, the Court held that
neither the fact that an inmate was placed in administrative segregation, nor the general
conditions therein, resulted in confinement that is atypical or posed a significant
hardship on the inmate vis a vis ordinary prison life, so as to give rise to a liberty
interest protected by the Due Process Clause.  *Id.* at 502-504.

> Accepting Inmates' version of the conditions in administrative
> segregation, as we must for purposes of review of the grant of summary
> judgment [to defendants], we conclude that although the conditions were
> more burdensome than those imposed on the general prison population,
> they were not so atypical that exposure to them for six months imposed a
> significant hardship in relation to the ordinary incidents of prison life.
>
> In sum, we conclude that viewing the conditions of confinement in
> administrative segregation that are alleged by Inmates in the light most
> favorable to them, the conditions do not implicate a liberty interest.  And,
> because they possessed no liberty interest in avoiding confinement in
> administrative segregation, the district court properly granted summary
> judgment in favor of prison officials on Inmates' procedural and
> substantive due process claims.

*Id.* at 504.

The DOC Defendants' Memorandum of Law addresses the plaintiff's due process
claim as follows:

> The Plaintiff does not allege facts which demonstrate that he has a
> liberty interest against being placed in the [QOL] program and in
> administrative segregation. As a general matter, administrative
> segregation programs and housing do not impose an atypical and
> significant hardship on an inmate in relation to the ordinary incidents of
> prison life contemplated within a sentence.  [Citing *Beverati*, 120 F.3d at
> 503-504; and *Sandin*, 515 U.S. at 486] * * * There is no atypical and
> significant hardship even when the time spent in administrative
> segregation is extensive.  *See Beverati, supra* (six-month administrative
> confinement in which inmates only allowed to leave cells three to four
> times per week, and had no outside recreation or educational or religious
> services available, and not an atypical and significant hardship); *Perkins v.
> Kan. Dep't of Corr.*, 165 F.3d 803 (10th Cir. 1999) (Inmate's long term
> segregation, over one year, in and of itself, did not create a liberty interest;
> issue was whether the specific conditions in administrative segregation –
> no exercise outside of cell, mask to be worn if inmate allowed out of cell,

no contact with other inmates, amounted to an atypical and significant hardship).

(ECF No. 32 at 14).

While the Supreme Court ruled in *Wilkinson v. Austin*, 545 U.S. 209 (2005), that the "totality of circumstances" to which inmates were subjected in the Ohio "super maximum" prison (prohibition of almost all human contact including cell-to-cell conversation, 24 hour a day lighting, one hour exercise in a small indoor room, indefinite placement, and disqualification for parole consideration) could be atypical and significant hardships which could implicate a liberty interest and its attendant due process requirements, the DOC Defendants contend that the conditions of confinement in segregation at MOCC, including the QOL program, do not rise to that level.  Their Memorandum of Law states:

> Unlike [the Ohio State Penitentiary (OSP)] the [QOL] program provides concrete guidelines and time frames to completing the program and being released from segregation, provides for regular reviews and hearings and does not affect parole eligibility.  This Court has consistently found that there is no liberty interest in the placement or assignment of a particular level of the [QOL] program at Mt. Olive.  *See Freeland v. Ballard*, 2011 WL 7394619 (S.D. W. Va.); *Taylor v. Rubenstein*, 2011 WL 2265537 (S.D. W. Va.); *Blake v. Perry*, 2011 WL 830092 (S.D. W. Va.); *Cockerham v. Rubenstein*, 2008 WL 417999 (S.D. W. Va.) (Not reported in F. Supp.2d) [Footnote omitted].  In *Cockerham*, for example, the United States District Court for the Southern District of West Virginia reviewed the very same [QOL] Program and found that an inmate had no liberty interest against his placement in the [QOL] Program.  Regarding inmate Cockerham's three year stay in the [QOL] Program from March 2004 to March 2007, the Court distinguished his assignment to the [QOL] Program from an assignment to the OSP in *Wilkinson* and found Cockerham's assignment not to be indefinite.  *Cockerham* noted that, unlike the once a year review in *Wilkinson*, the [QOL] Program provided frequent reviews for advancement at which inmate Cockerham had the opportunity to attend and make statements.  The Plaintiff, here, only alleges "martial law" as an adverse condition of his confinement and provides no facts, which if true, would cause this Court to deviate from its prior decisions that continued placement in the [QOL] program implicates a liberty interest.

(ECF No. 32 at 15-16).

The plaintiff's Responses assert that, based upon *Wilkinson*, the federal constitution does extend due process protections to prisoners placed in long-term administrative segregation, and requires at least "an informal nonadversary review of the information supporting [the [prisoner's] administrative confinement." 545 U.S. at 229. (ECF No. 37 at 20-21; ECF No. 39 at 24-25). The plaintiff asserts that the review requires officials to provide a brief summary of the factual basis for the classification review, an opportunity for the prisoner to present his position to the decision-maker(s) and that the decision-maker provide a short statement of reasons for their decision. (ECF No. 37 at 21; ECF No. 39 at 27-28).

The plaintiff further relies upon state law to assert that "a prisoner retains basic due process guarantees under the West Virginia Constitution. (ECF No. 37 at 18-19; ECF No. 39 at 25-26). Both of his Responses assert:

> "The touchstone of due process is protection of the individual against arbitrary action of government." *State ex rel. Gillespie v. Kendrick*, 164 W. Va. 599, 604, 265 S.E.2d 537, 540 (1980) (quoting *Dent v. W. Va.* 129 U.S. 114, 123 (1889)). Accordingly, West Virginia courts have recognized that due process protections apply to inmates be[ing] transferred into "more restrictive living environments ," such as ad seg with policies or directives ordering martial law or no efforts to temper in seg units. [*Crain v. Bordenkircher*, 176 W. Va. 338, 347, 342 S.E.2d 422, 431-32 (1986)].

(ECF No. 37 at 19; ECF No. 25-26). The plaintiff further contends that the Supreme Court of Appeals of West Virginia (the "SCAWV") has adopted six minimum due process standards:

> (1) A written notice setting forth the intention of the institution to reclassify or reassign the inmate from a housing unit to a more restrictive housing unit; (2) The written notice should contain the reasons why the institution has elected to reclassify or reassign the inmate to a more restrictive housing unit; (3) An opportunity to be heard before a neutral and detached hearing body within a reasonable period of time following

receipt of the written notice setting forth the intentions and reasons for the reclassification or reassignment; (4) The requirement of a written statement by the neutral and detached hearing body as to the evidence called on and reasons for any adverse action designed to implement the original intention to transfer; (5) The right to appeal the decision of the neutral and detached hearing body to a neutral and detached officer appointed by the Warden; and (6) The requirement that no reclassification or reassignment shall take place until all procedural safeguards are exhausted.

(ECF No. 37 at 19-20; ECF No. 39 at 26). The plaintiff appears to contend that these procedures should have been applicable to his May 22, 2013 scheduled hearing to move him from Level Three to Level Four.  (*Id.* at 20).

The DOC Defendants' Reply asserts that the plaintiff is essentially arguing "that because West Virginia courts have determined that his assignment to administrative segregation creates a cognizable liberty interest under the West Virginia Constitution, this Court should or must find that the Plaintiff has a cognizable liberty interest against placement in administrative segregation under the United States Constitution."  (ECF No. 42 at 6).  Their Reply further states:

> In as much as the Plaintiff seeks this Court to find that there is a due process violation under the West Virginia Constitution, this Court lacks jurisdiction.  42 U.S.C. § 1983 requires that the plaintiff set forth a violation of federal law or of the United States Constitution.  *Blue v. Craig*, 505 F.2d 830 (1974).  Violations of state constitutional rights or of state statutes do not form a basis for Section 1983 claims.  *Handley v. City of Seagoville*, 798 F. Supp. 1267, 1271 (N.D. Tex. 1992).

(*Id.* at 6-7 n.3).

The undersigned notes that the plaintiff's statement of jurisdiction in his Amended Complaint asserts only that his claims arise under the Constitution and laws of the United States, and does not specifically allege any claim brought under the West Virginia Constitution.  Accordingly, the plaintiff should not be permitted to assert a claim based upon state law for the first time in his Response briefs.

Following the reasoning of the Supreme Court in *Sandin*, the undersigned finds no liberty violation implicated in the decisions of prison staff which caused the plaintiff to be placed in administrative segregation, and as it is not atypical for inmates to be placed in administrative segregation for any number of reasons. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *Beverati v. Smith*, 120 F.3d at 502-04 ("confinement to administrative segregation does not implicate a liberty interest"). The plaintiff has no right to notice and an opportunity to be heard prior to his re-assignment to administrative segregation, as a prisoner has no liberty interest in being housed in any particular prison facility. *See Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983); *Meachum v. Fano*, 427 U.S. 215 (1976).

The holdings in *Sandin*, *Beverati* and *Wilkinson* establish that the plaintiff has failed to state a facially plausible claim in violation of the Fourteenth Amendment. Accordingly, pursuant to the holdings in *Twombly* and *Iqbal*, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state a claim upon which relief can be granted with regard to Count Two of his Amended Complaint concerning alleged due process violations.

### C.     Count Three – Cruel and Unusual Punishment.

In Count Three of his Amended Complaint, the plaintiff alleges that defendants Caudill, Perry, Ballard, Blake and Pennington "exercised deliberate indifference to plaintiff" by dropping him down in the QOL program, moving him from Q I to Q II knowing it has been placed on martial law, where all rights are stripped leaving plaintiff no constitutional rights at all, because he refused to denounce his Messianic Jewish faith." (ECF No. 12 at 8-9). Consequently, the plaintiff alleges that he has been

subjected to cruel and unusual punishment, in violation of the Eighth Amendment, "for expressing religious beliefs." (*Id.* at 9).

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" This is a low standard. The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.*, at 833.

Moreover, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." *Id.*, at 834. (Citations omitted.) The Supreme Court rejected an argument that an objective test of deliberate indifference be established.

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id., at 837.

The defendants' Memoranda of Law focus on the issue of whether long-term segregation can be considered cruel and unusual punishment. To the extent that the plaintiff's claim relies upon this theory, the undersigned agrees with the defendants that

it is well settled that long-term segregation, in and of itself, does not state an Eighth Amendment claim.  (ECF No. 29 at 7; ECF No. 32 at 17).

However, as noted by the plaintiff in his Responses, his cruel and unusual punishment claim is focused on his "demotion" in the QOL program, and his transfer from the Quilliams I ("Q I") segregation unit to the Quilliams II ("Q II") unit, which the plaintiff describes as being "under 'martial law."[4]  The plaintiff's Responses assert that this action was taken "with wanton, malicious, sadistic, reckless, and egregious intent to punish, intimidate, and coerce him into renouncing central tenets of his religion . . . ." (ECF No. 37 at 22; ECF No. 39 at 28-29).    The plaintiff further asserts that this policy has resulted in atypical and significant hardships to him, including being subjected to at least one instance of a use of force with pepper spray, which is the subject of a separate lawsuit pending in this court.  (ECF No. 37 at 21-26; ECF No. 39 at 28-33).

The DOC Defendants' Reply first alleges that the plaintiff has not set forth any specific events or physical conditions that would necessarily support a plausible Eighth Amendment violation.  (ECF No. 42 at 7).  Their Reply states:

> The Plaintiff instead alleges, first, that he is subject to "martial law," which he defines as "a state in which civil laws and civil rights are suspended in lieu of military control."  The Plaintiff, however, does not specify what particular civil laws or civil rights have actually been suspended.  The Plaintiff is serving a sentence of incarceration and, as a matter of law, certain civil laws and civil rights are suspended while he serves his sentence.  While factual allegations supporting the claim need not be made in detail, the complaint must contain "more than labels and conclusions" or a formulaic recitation of the elements of a cause of action" and the court is "not bound to accept as true a legal conclusion couched as a factual allegation."  [*Twombly*, 550 U.S. at 555.]

---

[4] The plaintiff uses the term "martial law" to describe an alleged policy implemented and enforced by "high ranking officials" at MOCC to allegedly allow unreasonable uses of force against inmates in the segregation units, essentially suspending rules and regulations concerning the proper procedures for the use of force.

(ECF No. 42 at 7).  The DOC Defendants further assert that the plaintiff's conclusory assertion that "efforts to temper" are not being required before force is used on Q II fails to sufficiently state a claim for relief under the Eighth Amendment in the context pled by the plaintiff in his Amended Complaint.  (*Id.* at 8).

The plaintiff has filed a Sur-Reply (ECF No. 45) which, *inter alia*, elaborates on his cruel and unusual punishment claim, describing his understanding of the alleged "martial law" policy and alleging facts concerning the use of force against him, which is the subject of a separate Complaint filed in Case No. 2:13-cv-32832.  The plaintiff asserts that this incident was a "major factor in forcing him to denounce his religious tenets."  (*Id.* at 13).

However, the plaintiff's Amended Complaint contains nothing more than conclusory statements that the defendants placed him in the most restrictive area of the prison as a punishment for expressing his religious beliefs.  Additionally, his allegations that the defendants subjected him to the "martial law" policy and the excessive use of force are essentially an attempt to bootstrap his religious exercise claims, which the undersigned has herein recommended be dismissed, with his Eighth Amendment claim, which is being litigated in his other case.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the allegations in the plaintiff's Amended Complaint fail to state a plausible Eighth Amendment claim and should be dismissed pursuant to the holdings in *Twombly* and *Iqbal*.  In the alternative, should the presiding District Judge find that the plaintiff has sufficiently stated an Eighth Amendment claim, the undersigned proposes that the presiding District Judge consider whether such claim would appropriately be consolidated and addressed with the claim raised in Case No. 2:13-cv-32832.

**D.      Count Four – Discrimination and Denial of Equal Protection.**

In Count Four of his Amended Complaint, the plaintiff alleges that all of the defendants "exercised deliberate indifference to the plaintiff" by refusing to allow him to practice his Messianic Jewish faith and that the defendants have continued to discriminate against the plaintiff for being a Messianic Jew and expressing his beliefs. This claim is largely repetitive of the plaintiff's allegations in Count One.  Nevertheless, the undersigned will address this claim under the Fourteenth Amendment Equal Protection Clause, rather than under RLUIPA, which was the focus of Count One.

The DOC Defendants' Memorandum of Law addresses this claim as follows:

"An equal protection claim arises when without adequate justification, similarly situated persons are treated differently by a governmental entity. U.S. Const. amend. XIV. Even so, 'the Constitution does not require things which are different in fact or opinion to be treated in law as though they are the same.' *Tignor v. Texas*, 310 U.S. 141, 147, 60 S. Ct. 879, 882, 84 L. Ed. 1124 (1940)." *Reffitt v. Nixon*, 917 F. Supp. 409, 415 (E.D. Va. 1996). To state a claim for an equal protection violation in a prison setting, "a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  To meet this requirement, a plaintiff is required to set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003). The Plaintiff, here, does not allege or point to any other inmate who was been judged program compliant, in spite of giving religious responses to educational programming, or judged program non-compliant, even though giving non-religious responses to educational programming.   Moreover, the Plaintiff does not allege any improper motive on behalf of the Defendants.   The Plaintiff alleges that the Defendants were simply "deliberately indifferent" to his religious needs. "Deliberately indifferent" is a legal conclusion, which does not meet the standard of pleading required under *Twombly*, supra.

In as much as the Plaintiff seeks to simply claim the Defendants have discriminated against him by requiring him to provide non-religious responses to his educational assignments, the analysis would be the same as for his claim of denial of free speech and religion in Count Five.

(ECF No. 32 at 17-18).  Defendant Blake's Memorandum of Law reiterates the assertion that the plaintiff has not sufficiently alleged or demonstrated that he was treated differently from similarly-situated inmates.  He cites this this court's parallel ruling in *Freeland v. Ballard*, 2011 WL 7394619 (S.D. W. Va. 2011).

The plaintiff's Responses to both of the Motions to Dismiss attempts to extrapolate this claim into a claim that the defendants have engaged in conduct that "belittles and derides his religion" and that the defendants' conduct essentially amounts to favoring certain religion over others, which, he appears to be alleging, is coercion that violates the Establishment Clause of the First Amendment.  (ECF No. 37 at 26-28; ECF No. 33-35).  The plaintiff's Responses do not specifically address the defendants' contention that he must be able to demonstrate that he was treated differently than other similarly-situated inmates in the QOL program.  He simply conclusively states that his allegations are sufficient to state a plausible claim that he was discriminated against and denied equal protection.  The defendants did not re-address this claim in their Reply.

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has wholly failed to plead any facts that would give rise to an equal protection claim based upon being found to be non-compliant with his educational programming because he was responding with non-responsive religious answers, and the attendant consequences thereof.  The plaintiff has not identified any similarly-situated inmates who were not found to be non-compliant.  Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiff's Amended Complaint fails to state a plausible claim of discrimination or denial of equal protection under the Fourteenth Amendment as alleged in Count Four of his Amended Complaint.

### E.   Count Five – Denial of Freedom of Speech.

In Count Five of his Amended Complaint, the plaintiff again alleges that all of the defendants "exercised deliberate indifference to the plaintiff" by failing to allow him to write Messianic Jewish beliefs in his QOL packets, and that this conduct "was done to silence the plaintiff and force him to write defendants' own thoughts and feelings," and "denied him the right to express his own ideas and opinions" in violation of his First Amendment rights.  (ECF No. 12 at 10).

Defendant Blake's Memorandum of Law describes the First Amendment rights retained by a prisoner as follows:

> In the free speech context, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrective systems." [*Dawson v. Toler*, 2009 WL 2526332, at *1 (S.D. W. Va. 2009)] citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

(ECF No. 29 at 8).  Defendant Blake further asserts that the educational packets in the QOL program require inmates to provide answers that are responsive and related to the subject matter, and are "not an exercise in free speech" that would be protected by the First Amendment.  (*Id.*)  His Memorandum of Law further states:

> Plaintiff's assignment was to complete worksheets on specific issues and topics concerning legitimate penological objectives, the most important of which is compliance.  Plaintiff's answers were not responsive to the topic presented, thus, he did not complete the assignment and was non-compliant.  First Amendment rights are inapplicable in this context and, accordingly, Count Five should be dismissed.

(*Id.* at 9).

The DOC Defendants' Memorandum of Law addresses the fact that, to the extent that the plaintiff is attempting to claim any alleged violation of the right to the free exercise of religion under the First Amendment, such a claim is subject to a less

stringent standard that a RLUIPA claim.   The First Amendment requires a determination that a prison policy or regulation or rule is "reasonably adapted to achieving a legitimate penological objective."  *See Lovelace*, *supra*, 472 F.3d at 200. (ECF No. 32 at 19 n.9).  The First Amendment also protects the right to freedom of speech.

The DOC Defendants rely upon the clearly-established precedent in *Turner v. Safley*, 482 U.S. 78, 89 (1987), in which the United States Supreme Court announced four factors that should be used to determine whether a restriction or prohibition placed on a prisoner is reasonably related to a legitimate penological interest, so as not to be unconstitutional.  The four factors are:

> (1) whether the regulation or act bears a "valid, rational connection" to a legitimate and neutral government objective; (2) whether prisoners have alternative ways of exercising the circumscribed right; (3) whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and (4) whether alternatives exist that full[y] accommodate the prisoner's rights at de minimus cost to valid penological interests.

482 U.S. at 89-91.  (ECF No. 19 at 18-19).  The DOC Defendants' Memorandum of Law further asserts:

> In the present case, the Plaintiff's speech and religious expression has been curtailed because the Defendants require that inmates, who have been assigned to administrative segregation due to their continued or serious misconduct, actually complete the educational programming assigned to provide that inmate with the behavioral skills and attitude needed to live in general inmate population in a safe, secure and orderly manner.  The requirements of the [QOL] program are reasonably related to a clear, legitimate penological interest and the Plaintiff has not set forth a claim that his first amendment rights of speech and religion have been violated.

(*Id.* at 19).

The plaintiff's Responses assert that, concerning restrictions on speech in the prison context, "'a legitimate penological interest' is valid when it protects the security of the prison, staff or inmates, which would involve threat, plans to escape and riot, obtain drugs and weapons, recruit for gangs, or rape." *Chavis v. Struebel*, 317 F. Supp. 2d 232, 238 (W.D.N.Y. 2004); *Jones v. State*, 447 N.W.2d 556 , 55758 (Iowa App. 1989); *Nieves v. Coughlin*, 156 A.D.2d 945, 550 N.Y.S.2d 205, 206 (N.Y. App. Div. 1990). (ECF No. 37 at 28; ECF No. 39 at 35-36). The plaintiff asserts that the defendants have inappropriately attempted to compare the QOL packets to "book reports." (ECF No. 37 at 28-29).

The plaintiff's Response to the DOC Defendants' motion further asserts:

> The Defendants allege that the Plaintiff's religious answers are not protected  as speech and expression because they do not show that he will have good behavioral skills and attitude needed to live in general inmate population in a safe, secure and orderly manner.  And in order to show that he will be a productive inmate he must complete QOL packets created by inmate Eugene Robert Anderson first without providing religious answers in them to prove he has good behavioral skills.

(ECF No. 39 at 36). The plaintiff challenges the assertion by the defendants that the inclusion of religious responses in the QOL packets interferes with the legitimate penological interest proffered by the defendants and points to a new program that was to be started at MOCC in September of 2014 called "Moral Rehabilitation," which the plaintiff describes as "a program that will allow inmates to earn a four-year college degree in Bible and theology." (ECF No. 39 at 36). The plaintiff quotes Commissioner Jim Rubenstein as saying that this program provides "the opportunity to make some truly positive changes not only within our Corrections system but that our efforts can be far reaching throughout the state." (*Id.*) The plaintiff asserts that the defendants cannot, on the one hand, restrict his religious speech and expression, which he claims

has also had a positive effect on prisoners and the prison environment and, on the other hand, promote this new program which also fosters the free expression of religion. (ECF No. 39 at 36-37). Thus, the plaintiff asserts that First Amendment protections are applicable to his claim and therefore, Count Five should not be dismissed. (*Id.* at 37).

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff has not demonstrated that the defendants improperly restricted his rights to freely express and communicate about his faith and religious beliefs. Rather, the limited restriction that was placed on the plaintiff not to answer the questions in his QOL packets solely with religious responses that do not in some way reflect a comprehension of the materials that were studied in the QOL program was clearly related to a legitimate penological interest of assisting inmates in learning behavior skills that will help them prepare for return to life in the general prison population and potentially in the world outside of the prison, and that the plaintiff had/has other avenues through which to express and share his religious beliefs.

Thus, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiff's has failed to state any plausible claim concerning the violation of his First Amendment rights as alleged in Count Five of his Amended Complaint.

### RECOMMENDATIONS

For the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that all of the claims in the plaintiff's Amended Complaint fail to state a claim upon which relief may be granted against any of the defendants (including defendants Pennington and Clemons, who have yet to be properly served with process). Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the plaintiff's Amended Complaint should be dismissed, in its entirety, pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure and the holdings in *Twombly* and *Iqbal, supra.*

Accordingly, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion to Dismiss filed by defendant Chris Blake (ECF No. 28) and the Motion to Dismiss filed by the DOC Defendants (ECF No. 31) and **DISMISS** this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to the plaintiff, and to transmit a copy to counsel of record.

February 27, 2015

Dwane L. Tinsley
United States Magistrate Judge